UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MALEK SAMUEL MALEK,<br><br>Defendant. | 4:14-CR-40125-01-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Malek Samuel Malek is before the court on an indictment charging him with conspiracy to distribute a controlled substance (methamphetamine), in violation of 21 U.S.C. §§ 841(a)(1) and 846. See Docket No. 1. He now moves to suppress certain evidence seized on October 14, 2014 pursuant to a search warrant. See Docket No. 47. The government resists Mr. Malek's motion. See Docket No. 52. This motion was referred to this magistrate judge to hold an evidentiary hearing and to recommend a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014 standing order of the Honorable Karen E. Schreier, District Judge. The following is this court's recommended disposition.

## FACTS

An evidentiary hearing was held in this matter on August 12, 2015. Mr. Malek was present in person at the hearing along with his lawyer,

Mr. David Alan Palmer, and an Arabic interpreter. Representing the government was Assistant United States Attorney Connie Larson assisted by third-year law student Jesse Goodwin. At the hearing, one witness testified and three exhibits were received. From this evidence, the court makes the following findings of fact.

## A. The Affidavit in Support of the Search Warrant

On October 14, 2014 Detective Jeff Thoreson of the Minnehaha County Sheriff's Office and the Sioux Falls Area Drug Task Force submitted an affidavit to a South Dakota state court judge in support of a request for a search warrant for Mr. Malek's hotel room in Sioux Falls. See Exhibit A. That affidavit set forth a summary of separate interviews with 14 informants who had given information to law enforcement independent of one another. Four of these informants had been interviewed by Det. Thoreson himself. In addition, the affidavit set forth additional facts obtained by law enforcement in their own investigation. A summary of the affidavit is as follows:

> **Source of Information (SOI) #1** told police in November 2013 that the week prior he had observed Mr. Malek associating with Gigilo[1] in the presence of large stacks of money and that each had a gun. SOI#1 said that the money was given to Mr. Malek in return for methamphetamine, marijuana, cocaine and mushrooms. SOI#1 observed a large Ziploc bag containing meth.

---

[1] In Det. Thoreson's affidavit, full names are given for many of the people who were allegedly associates of Mr. Malek. The affidavit also gave the full name and address of hotels and motels discussed in the affidavit, and complete street addresses for various residences discussed. In an effort to avoid casting any person, property or business in a bad light, the court has omitted the details identifying these things. A reviewing court as well as the parties to this case have access to Exhibit A, which contains the full information.

**SOI#2** told police in November 2013 that David sells meth, crack cocaine and marijuana out of a studio on Carolyn Avenue in Sioux Falls.  The studio was described as being near Scarlet's.

**SOI#3** told police on December 19, 2013 that he was in jail with Gigilo Terrett, who told SOI#3 that Gigilo's source of meth was Mr. Malek, whose nickname was "Bones."  Gigilo was willing to hook SOI#3 up with Mr. Malek if SOI#3 was willing to sell large amounts of meth and marijuana.  Gigilo proposed introducing SOI#3 to his girlfriend, Miranda, and then Miranda would introduce SOI#3 to Mr. Malek.

**SOI#4** told police on January 18, 2014 that he was involved in producing music and videos at David's Carolyn Avenue studio.  SOI#4 witnessed David selling marijuana and meth at this studio along with other associates, including one known as "Bone."  SOI#4 identified Bone as David's meth source and stated that Bone obtained meth in pound quantities from Kansas City and brought it back to Sioux Falls for distribution.  SOI#4 said drug sales at the studio took place at night during parties, and during the daytime at the studio back door.

**SOI#5** engaged in a "clear out" interview with police in February, 2014 in which he told them that Gigilo was getting his meth from a black male named "Bone," who SOI#5 said was Mr. Malek.  SOI#5 identified Mr. Malek via an unmarked photograph.  SOI#5 said that Mr. Malek kept meth and cocaine in his vehicle, a tan SUV.  SOI#5 said Mr. Malek kept a gun between the seats of this SUV.  SOI#5 said that Mr. Malek sold meth with David from their music studio near Scarlet O'Hara's.

**SOI#6** told Det. Thoreson on March 20, 2014 that Bone sells meth, but does not carry his "weight" with him.  Rather, Bone leaves, goes to get meth, and delivers meth within an hour.  Bone usually rents cars and hotel rooms, but SOI#6 did not know where Bone kept the bulk of his meth.  SOI#6 said Bone could get you up to a pound of meth at any given time.  SOI#6 identiied Bone as Mr. Malek by viewing a photograph of him.  SOI#6 also told police that Bone and David owned a studio together near Scarlet's, and although David sold drugs, he did not work together with Bone on drug trafficking.

On March 26, 2014 police investigated a report of a larceny at a Sioux Falls motel that had been rented by Mr. Malek.  Police interviewed a housekeeper at the hotel who told them Mr. Malek had stayed at the hotel for approximately 2 years, paying $357 per

week in rent. The housekeeper told police that Mr. Malek was only at the hotel every other weekend and that he normally drives rental cars. She stated that Mr. Malek was always changing the vehicles he drives.

**SOI#7** told Det. Thoreson at the end of May, 2014 that Bones is a tall African black male who drives a tan suburban with tinted windows. SOI#7 told police that Bones frequented a specific house on South Summit Avenue and gave a description of the appearance of the house. Police verified the existence of a house on South Summit Avenue matching the description SOI#7 gave. SOI#7 said he had purchased meth himself from Bones on a couple of occasions. SOI#7 also said "Vidal" lived at the Summit Avenue home. Police verified that someone whose middle name was Vidal lived at the Summit Avenue house.

**SOI#8** told police in May, 2014 that Bones is a black male from Kansas City who sells meth in Sioux Falls. SOI#8 said that Bones deals out of a house on South Summit Avenue. SOI#8 supplied the exact address of the house and stated that Bones drives a teal Pontiac G6.

**SOI#9** told Det. Thoreson at the end of June, 2014 that four months prior they had purchased an 8-ball of meth from an African black male known as Bones. The transaction took place at a Sioux Falls hotel near I-90. SOI#9 said Bones purchases meth in Sioux City and brings it back to Sioux Falls to sell. SOI#9 said Bones deals with Africans and bikers.

**SOI#10** told police in a "clear out" interview in July, 2014 that a black male named Malek Malek aka Bones brings meth into Sioux Falls from out of state. SOI#10 said they had seen Bones with ½ pound of meth at the home of Gigilo and described the location of the home. SOI#10 identified this as the apartment of Miranda, Gigilo's girlfriend. SOI#10 said Gigilo had cocaine at this location that he had obtained from Mr. Malek. SOI#10 said Mr. Malek was obtaining his drug supply from Arizona. SOI#10 also said Mr. Malek hangs out at a music studio near Scarlet's. The smallest amount of meth SOI#10 had ever seen Mr. Malek with was an ounce.

On July 11, 2014 police arrested Stewart in Sioux Falls who was discovered to have Morphine pills in his possession. He told police he was living at the address on South Summit Avenue previously identified by other informants.

On July 14, 2014 police surveilled the South Summit Avenue house and saw Mr. Malek enter a tan Chevrolet Tahoe and leave the address. Later, police effected a traffic stop and found that Mr. Malek's passenger had a small amount of marijuana in his possession. Mr. Malek was cited for a traffic violation and released. Mr. Malek parked his Tahoe, walked away, entered another vehicle and left.

The next day police again surveilled the South Summit Avenue house. They observed a vehicle pull up to the curb and a black male walked up to the car from the residence. The black male handed the driver, Matthew, something smaller than his hand and the driver handed the black male some cash. Det. Thoreson described this in his affidavit as a "short term stop" or a "hand to hand" transaction. While the first transaction was taking place, another vehicle pulled up and stopped in the middle of the street. The male from the residence went to the driver's window of the second car and handed the driver something. Both transactions lasted less than two minutes. **SOI#11** had previously identified Matthew, the first driver in the above-described transactions, as a meth purchaser.

On the next day, July 16, 2014, police again surveilled the South Summit Avenue home. They observed Mr. Malek exit the home and enter a black Dodge Charger vehicle. Mr. Malek left and drove an erratic route to a motel. He entered room #104 at the hotel, stayed for 18 minutes, then left again. He again drove an erratic route back to the South Summit Avenue house. Upon arrival, he parked on the roadside, staying inside the vehicle. After five minutes, he left and drove around the area, returning in a few minutes. Det. Thoreson described this as a "bum run," a ploy used by drug traffickers to see if they are being followed by police.

On July 21, 2014, at approximately 4 p.m. the police observed the black Dodge Charger described above parked near room #104 of the same hotel. Later, at 10:30 p.m., they observed the same Charger parked in the driveway at the South Summit Avenue house.

On July 22-24, 2014 police verified that room #104 at the previously-described hotel was rented to Mr. Malek. Hotel management identified Mr. Malek. Police learned that Mr. Malek had been staying at this hotel since July 11, 2014. He paid the hotel $938.56 in cash and was due to check out of the hotel the next day. On July 28, 2014 police verified that Mr. Malek had indeed checked out of the hotel.

Det. Thoreson stated in his affidavit that drug traffickers often stay at one location, while storing their drug supply at a second location, the "stash house." The officer noted that while Mr. Malek had stayed at one hotel for approximately two years (the location where police investigated the larceny), he had rented room #104 for only two weeks.

On July 24, 2014 police observed Mr. Malek's black Dodge Charger parked at the South Summit Avenue home at 1:00 p.m.

On July 26, 2014, police responded to a report of a disturbance at a bar on 41st Street in Sioux Falls. The previously-described Charger was reportedly involved in the disturbance. When police attempted to initiate a traffic stop on that vehicle, Mr. Malek, driving, took off at a high rate of speed and escaped from police. This resulted in an arrest warrant for aggravated eluding being issued for Mr. Malek. The registered owner of the black Dodge Charger was someone other than Mr. Malek. When police contacted the owner, the owner told them that he allowed a black African guy to take his car, but the owner professed not to know the man's name or phone number.

At 11:00 a.m. on July 28, 2014 the tan Chevrolet Tahoe previously identified by SOI#5 and SOI#7, and seen on July 14 by police at the Summit Avenue home, was again seen parked at the South Summit Avenue home.

**SOI#12** told Det. Thoreson in August, 2014 that he knew a guy known as "Bones," whose real name was Malek, who supplied Sioux Falls with meth. SOI#12 said Bones brings meth to Sioux Falls from Rochester, Minnesota. SOI#12 personally purchased up to ½ ounce at a time from Bones, and has purchased meth from Bones approximately 30 times from May to June, 2014. The most meth SOI#12 ever saw in Bones' possession was ½ kilo, which was observed at the studio Bones co-owned with David. SOI#12 described Bones and David hiding drugs in the ceiling at the recording studio.

**SOI#13** told police in September, 2014 that Bones was a meth dealer. SOI#13 identified a while female named Jaimie who obtains her meth from Bones. SOI#13 has traveled with Jaimie to Bones' house in order for Jaimie to buy meth from him. SOI#13 described the vehicle Bones drove as a tan Tahoe and said Bones was a larger black male. SOI#13 identified Mr. Malek as Bones after seeing a photograph of Mr. Malek. SOI#13 witnessed Mr.

Malek selling a ½ ounce of meth to Michelle. Michelle is known to the Sioux Falls Area Drug Task Force as a meth dealer.

On October 2, 2014 police conducted a traffic stop on a gray 2011 Nissan Rogue shortly after that vehicle had paid a visit to the South Summit Avenue house. Officers found marijuana in the vehicle. One of the occupants of the vehicle stated that she and the driver had just purchased the marijuana from a black male at the South Summit Avenue house. It was too dark for the woman to positively identify the black male.

**SOI#14** spoke to police in September 2014 and told them that SOI#14 stayed at the house on South Summit Avenue, which SOI#14 described as a big drug house. SOI#14 described two African-American males involved in drug trafficking at the house, one named Vidal and another named Bones. Bones sold crack and meth and usually kept his drugs in a tan Tahoe parked in the garage. SOI#14 identified a black Charger as another vehicle which Bones drives. SOI#14 was with Bones one night when Bones had 8 ounces of meth in the vehicle. SOI#14 also told police that Bones picked up a load of meth in Minneapolis in a red Ford Ranger with Iowa license plates belonging to Austin. Bones paid Austin rent for the use of the Ranger with meth. On September 16, 2014 SOI#14 and the owner of the red Ford Ranger obtained meth from the South Summit Avenue house.

On October 10, 2014 police obtained a search warrant for the South Summit Avenue house. The search uncovered a baggie containing 5.2 grams of meth and a digital scale with meth residue on it. Although Mr. Malek was not present at the time of the search, an occupant of the house told police he was residing at a named motel on east 10th Street in Sioux Falls and that he was driving a new white SUV.

Police went to the hotel and observed Mr. Malek arriving there, driving a new white SUV. Mr. Malek exited the vehicle and entered room 321. Officers arrested Mr. Malek at this time on the outstanding eluding warrant. Police then obtained a search warrant for room 321, which was rented to someone other than Mr. Malek. The search of room 321 revealed 2.5 ounces of crystal meth.

When Mr. Malek was arrested, he had on his person a hotel room key for a fourth hotel on Gateway Boulevard in Sioux Falls. Police contacted this hotel and learned that Mr. Malek had been

renting room number 139 at the hotel since August 31, 2014, paying his rent in cash.

See Exhibit A.

Based upon the above information, Det. Thoreson applied for and obtained a search warrant for room 139 for the hotel on Gateway Boulevard. See Exhibit B. Det. Thoreson participated in the execution of the search warrant at room 139 along with other officers. Police found two handguns, live ammunition, two magazines, digital scales with residue, three Rubbermaid containers containing plastic bags in which there was a total of 709.6 grams of crystal meth, sandwich bags, and Mr. Malek's rental agreement for room 139. See Exhibit C.

## B.    Other Information Known to Det. Thoreson and Not in the Affidavit

Information referenced in the affidavit as coming from an "intelligence report" could come from citizens, informants, or defendants—someone outside law enforcement. It could potentially include those with a motive to make up facts to incriminate a suspect.

Except for the four SOIs that Det. Thoreson himself interviewed face-to-face, Det. Thoreson did not speak to any of the other SOIs. Except for those SOIs interviewed by Detective Cook and Detective Spaeth, Det. Thoreson did not contact the other police officers who conducted the other interviews. As to interviews conducted by Detectives Cook and Spaeth, Det. Thoreson verified with those two detectives that their reports of their interviews with SOIs were accurate.

The vast majority of the interviews with SOIs were post-Miranda interviews, meaning the SOI had already been arrested or was being held in custody.  Det. Thoreson assumed the SOIs all had criminal history in the form of arrests or convictions for criminal offenses.

Det. Thoreson did not himself pay or offer compensation for the four SOIs he interviewed.  He did not make inquiry to find out if any of the other SOIs were compensated in some way for giving police their information. Det. Thoreson did not personally contact the housekeeper at the hotel where the larceny report was made to verify details of her information or assess its reliability.  Det. Thoreson did not personally contact Austin to verify whether he loaned Mr. Malek his red Ford Ranger.

Det. Thoreson did personally participate in the surveillance of the South Summit Avenue home.  He personally witnessed Mr. Malek coming and going from that house on several occasions.  Det. Thoreson never witnessed Mr. Malek do anything illegal except drive a vehicle with a suspended driver's license.

Mr. Malek now moves to suppress the evidence seized pursuant to the search warrant issued as to room 139 on Gateway Boulevard.  He argues that the affidavit in support of the search warrant failed to establish probable cause because there is insufficient information about each one of the 14 informants from which the issuing judge could have determined their reliability and credibility.  In addition, he argues that the Leon good faith exception does not apply in this case.  The court analyzes these arguments below.

**DISCUSSION**

**A.    Whether the Search Warrant Lacked Probable Cause**

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Thus, the Fourth Amendment requires that search warrants be based upon probable cause.  Mr. Malek argues that the search warrant in this case lacked probable cause for the search because reliability and the credibility of the informants who provided information were not demonstrated in Det. Thoreson's affidavit.

"When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists."  United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573 F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))).  See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties."  United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue

of probable cause should be paid "great deference." United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hypertechnical" approach. Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))). "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." O'Dell, 766 F.3d at 874; Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause. United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. De La Fuente, 548 F.2d 528, 534 (5th Cir. 1977). Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable:

> Information may be sufficiently reliable to support a probable
> cause finding if the person providing the information has a track
> record of supplying reliable information, or if it is corroborated by
> independent evidence. If information from an informant is shown

11

to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.

Williams, 10 F.3d at 593 (citing Gates, 462 U.S. at 233-34; Draper v. United States, 358 U.S. 307, 313 (1959)).

Thus, an informant is considered to be reliable and credible if the supplied information is at least partially corroborated by other sources. Humphreys, 982 F.2d at 259; see also United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (court held that search warrant was based on probable cause when the affidavit contained only (1) the informant's statement that the defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison). Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant. United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998). Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause. Id.; United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008).

Although the credibility and reliability of informants are important considerations in the probable cause inquiry, "they are not 'separate and independent requirements to be rigidly exacted in every case.' " United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001) (quoting Gates, 462 U.S. at 230)). That is, an informant's statements must be weighed within the totality of the

circumstances. Tyler, 238 F.3d at 1039. In addition, probable cause may be established by the observations of law enforcement and by circumstantial evidence. United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000). An important consideration in establishing the credibility and reliability of an informant is whether law enforcement had the opportunity to meet personally with the informant to assess his credibility and whether the informant's information is based on first-hand knowledge rather than rumor or innuendo. Nieman, 520 F.3d at 839-40; see also Wells, 223 F.3d at 839 (court noted that police must engage in suitable corroboration of the informant's information if the informant's reputation cannot be assessed because the informant is anonymous). "[T]here is an inherent indicia of reliability in the richness and detail of first hand observation" by an officer of an informant and the ability of police to question the informant face-to-face gives greater weight to the officer's decision to rely on the informant's first-hand observations. United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994).

The Eighth Circuit addressed the issue of confidential informants in Tyler, 238 F.3d 1036. In Tyler, the defendant pled guilty to two counts of possession of crack cocaine with the intent to distribute after police executed a search warrant and found evidence of drugs. Id. at 1038. On appeal, the defendant argued that this evidence should have been suppressed because the underlying search warrant lacked probable cause. Id. The defendant specifically challenged the credibility and reliability of the information supplied to law enforcement by a drug-offender-turned-police-informant because the

informant was not known previously to the police as a reliable source of information.  Id.

The court rejected the defendant's argument, stating that the information supplied by the informant had been independently verified by the police, in part through a controlled buy of cocaine from the defendant.  Id. at 1039.  The court noted that it "strongly endorsed the use of corroboration as a method of confirming the reliability of the information given to police," and "[e]ven 'the corroboration of minor, innocent details can suffice to establish probable cause.' "  Id. (quoting United States v. Ramos, 818 F.2d 1392, 1397 n. 7 (8th Cir. 1987)); cf. Wells, 223 F.3d at 840.

The court also held that the informant's statements were presumptively credible because the statements were made against the informant's penal interest.  Id.  The informant admitted to illegal activities (e.g., past narcotic purchases from the defendant) beyond that which the police already knew.  Id. Such statements against penal interest "typically 'carry considerable weight.' " Id. (quoting United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996)).

In Smith, a paid confidential informant made three controlled drug purchases from defendant while under police surveillance.  United States v. Smith, 266 F.3d 902, 904 (8th Cir. 2001).  State police officers applied for a search warrant and submitted an affidavit noting the three transactions and that the informant had provided reliable information to the police in the past. Id. at 904, 905.  The defendant argued that the search warrant was invalid in part because the affidavit contained a false statement regarding the use of the

informant by the police in the past.  Id. at 905.  The court found that even if the affidavit for the search warrant contained knowingly false or misleading statements, the remaining content of the affidavit–the record of controlled drug purchases–was sufficient to establish probable cause.  Id.

In contrast, in Wells, the Eighth Circuit found that the search warrant affidavit did not support a finding of probable cause.  Wells, 223 F.3d at 839. Police received two anonymous tips from callers stating that they had *received* information that the defendant and two other men were responsible for two drive-by shootings.  Id. at 837.  However, only *one* of the anonymous callers stated the vehicle and weapons used in the shootings were hidden in the garage of a duplex rented by the defendant's girlfriend at a specified address. Id.  A witness to one of the shootings also told police a dark-colored vehicle was seen leaving the area.  Id.  Police verified that the utilities for the duplex were in the name of the defendant's girlfriend, that the girlfriend was indeed the defendant's girlfriend, and that all three of the alleged shooters were associates of each other.  Id.  This information was included in the search warrant affidavit.  Id.

The affiant, Officer Lane, proceeded to the duplex where he observed the defendant washing a dark *blue Buick* Park Avenue automobile.  Id.  In the affidavit, Officer Lane stated that the defendant's vehicle matched the description given by the witness to one of the shootings, when in fact the witness had described the vehicle as a new *Lincoln* that was either dark *green or black* in color with tinted windows.  Id. at 837-838.  Based on this

15

information, Officer Lane applied for and received a search warrant of the duplex where weapons were found, thus leading to the defendant's indictment. Id. at 838.

The defendant moved to suppress the evidence seized from the duplex on the ground that the search warrant lacked probable cause. Id. At the suppression hearing, Officer Lane acknowledged the difference between the witness' description of the vehicle used in the shooting and the vehicle Officer Lane observed at the duplex. Id. The district court found that the affidavit's description of the vehicle was central to the conclusion that the vehicle used in the shootings matched that seen in front of the duplex. Id. The court found that this misstatement or omission misled the judge who issued the search warrant and that "a properly reconstructed warrant lacked sufficient information to support a finding of probable cause that evidence of the shootings would be found at [the duplex]." Id. The court concluded that the defendant had established a Franks violation and that the evidence seized from the duplex should be suppressed. Id.

The government appealed to the Eighth Circuit, but only as to the district court's determination that a properly reconstructed search warrant lacked sufficient information to support a finding of probable cause. Id. at 839. The Eighth Circuit upheld the district court's ruling, finding that the police failed to properly corroborate information provided by the anonymous callers. Id. The court explained as follows:

> When suspicions arise not from any observations of police officers "but solely from a call made from an unknown location by an

16

unknown caller," whose reputation cannot be assessed, the police must engage in suitable corroboration of the alleged criminal activity. Suitable corroboration must exhibit sufficient indicia of reliability in order for an anonymous tip to provide either a reasonable suspicion of criminal activity or probable cause to arrest or to search.

Id.

In determining that the search warrant lacked probable cause, the court found the following facts persuasive: (1) the callers remained anonymous and unknown to the police; (2) the callers stated that they received information regarding the defendant, thus, the callers "did not report any first-hand information or intimate details that could provide a reliable basis for this purported knowledge"; (3) the police were only able to corroborate innocent details of the location of the duplex, the alleged shooters' association with each other, and the relationship between the defendant and his girlfriend; and (4) the police failed to corroborate any allegation of criminal conduct by the defendant or any allegation of criminal activity at the duplex. Id. at 839-40. The court found that the link between the shootings and the duplex was missing if the vehicle description was set aside because only one anonymous caller stated that the vehicle used in the shooting was located at the duplex. Id. Without corroboration from another source–the witness or another informant–the information provided by only one of the anonymous callers was insufficient to establish probable cause. Id. at 840. Thus, the court upheld the district court's suppression of the evidence seized from the duplex. Id.

In Det. Thoreson's affidavit, Mr. Malek correctly points out very little detail about the reliability or credibility of each of the 14 sources of information

is set forth.  For example, the affidavit does not state what any of the informants' criminal history is, whether they received some form of compensation for their information, nor whether they have provided reliable information in the past.  In addition, Mr. Malek points out one of the informants was passing on hearsay rather than first-hand observations, some of the informants did not make statements against their penal interest, none of the informants made any predictions about future conduct, and none of the informants appeared before the state court judge which issued the warrant.

In addition, Mr. Malek correctly points out that many ordinary details that could have been corroborated by Det. Thoreson were not:  he did not verify whether Mr. Malek and David had any official business relationship reflected in any government records, he did not verify in whose name the music studio near Scarlet's was titled or rented, he did not verify phone records for Mr. Malek, he did not verify whether the home on Bragstad was in Gigilo's name or in his girlfriend's name,[2] and he did not verify the information provided by the hotel housekeeper when the larceny was reported.  Mr. Malek asserts because the affidavit fails to set forth the reliability and credibility of each of the 14 informants, the search warrant based on that affidavit lacks probable cause.

---

[2] Det. Thoreson stated in his affidavit that SOI#10 told police that Mr. Malek had ½ pound of meth at "Gigilo's" apartment, but then in the next sentence, said that the apartment was "Gigilo's girlfriend's" apartment, which police deduced was on Bragstad Street.  This discrepancy as to the location of the described event was never cleared up in the affidavit.  See Exhibit A at ¶ 13.

If the court were to examine separately the facts alleged about each informant, the court would no doubt agree that the affidavit lacked probable cause. No information provided by any single informant is sufficient to provide probable cause for the search warrant. However, the legal test is not to break the affidavit down into its individual components and examine each alone for probable cause. Rather, the test is the totality of circumstances. <u>Grant</u>, 490 F.3d at 632. At some point, the sheer volume of informants in this case, each reporting to law enforcement independent of one another, and each relaying similar information about Mr. Malek and his activities--sometimes exactly the same information--adds up to probable cause. <u>Tyler</u>, 238 F.3d at 1039 (where an informant's information is corroborated, even in part, by police or other sources of information the court may conclude the informant is reliable).

The court notes that an affiant is not required to include an informant's criminal history or cooperation agreement if the informant's information is at least partially corroborated. <u>United States v. Flagg</u>, 919 F.2d 499, 501 (8th Cir. 1990). Because informants frequently have criminal histories and often provide information to the government in the hope of obtaining leniency or some other benefit, a judge issuing a search warrant would not be misled by the omission of such information as such information is not clearly critical to the finding of probable cause. <u>Id.</u>; <u>see also</u> <u>Williams</u>, 477 F.3d at 558 (court held that "an affidavit is not robbed of its probative effect by its failure to mention that the informant 'was a paid informant who avoided prosecution by virtue of her testimony...' ") (citing <u>United States v. Milton</u>, 153 F.3d 891, 896

19

n. 3 (8th Cir. 1998)); United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002) ("search warrant affidavits need not provide judicial officers with all the details of bargaining between police and arrested persons from whom they are seeking to get information"). So the failure of Det. Thoreson's affidavit to recite each informant's criminal history is not fatal—especially because each informant's information was corroborated at least in part by other informants or by information the police gained first-hand through their own investigation.

In addition, Det. Thoreson's affidavit recited that all 14 of the unnamed informants gave their statements to law enforcement. Four of them were interviewed personally by Det. Thoreson himself. The obvious implication of the fact that these informants were giving statements to law enforcement was that they were probably entangled in the criminal justice system in some way, and likely were facing criminal charges. Thus, even if the affidavit did not recite the criminal histories of the 14 informants, that that they probably had criminal histories is clearly implied.

The affidavit did not state whether the informants were receiving monetary pay or some other compensation for their cooperation with law enforcement. However, several of the descriptions stated the informant gave his or her statement as part of a "clear out." From this, the court infers the clear out interviews were final interviews conducted with informants who had been cooperating with law enforcement prior to the conclusion of the relationship between the informant and the police. Thus, again, the implication is that the informants were cooperating with police, probably

pursuant to an arrangement that benefited the informants in some way. The issuing court, as would any reader of the affidavit, would reach the same conclusion.

That the affidavit recites Det. Thoreson interviewed four of the informants personally is a fact entitled to great weight. Information from an informant gleaned this a way has "an inherent indicia of reliability in the richness and detail of first hand observation" which lends greater weight to the officer's decision to rely on the informant's information. Robertson, 39 F.3d at 893.

Not all of the informants gave information against their own penal interests, but the majority of them did. When an informant makes an admission against his or her penal interests, this lends further reliability to the information being provided. Tyler, 238 F.3d at 1039.

Finally, only one informant's information appears to have been hearsay rather than first-hand observation—the information relayed by SOI#3. The other informants were passing along information they had learned first-hand.

In a supplemental brief filed after the hearing, Mr. Malek argues that the information provided in paragraphs 2-13 was stale. Stale information alone cannot provide probable cause to support a search warrant, but there is no bright-line test for determining when information is stale. United States v. Stachowiak, 521 F.3d 852, 856 (8th Cir. 2008) (citing United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993)). "Simply counting the numbers of days between the occurrence of the facts supplied and the issuance of the affidavit is

not sufficient." Id. (citing Koelling, 992 F.2d at 822) (citing United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1994)). "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." Id. In the Stachowiak case, a known CI provided information that was one month old at the time the search warrant was applied for. Id. The CI said he saw the defendant in possession of a firearm and that the defendant was selling one and one-half pounds of methamphetamine a day. Id. The court found the information was not stale. Id. See also United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001) (holding that information a month old about a drug transaction was not stale information in light of the ongoing nature of the crime).

The Eighth Circuit has concluded that several-months-old information that someone illegally possessed a firearm was not stale because "individuals who possess firearms tend to keep them for long periods of time." United States v. Neal, 528 F.3d 1069, 1074 (8th Cir. 2008) (citing United States v. Kennedy, 427 F.3d 1136, 1142 n.5 (8th Cir. 2005)). See also United States v. Perry, 531 F.3d 662, 666 (8th Cir. 2008) (not unreasonable for officer to believe defendant retained firearm 8 months following a homicide and, therefore, information in support of search warrant was not stale); United States v. Maxim, 55 F.3d 394, 397-398 (8th Cir. 1995) (holding that survivalists and firearms enthusiasts retain their weapons for long periods of time).

The court notes that some of the informants provided information about Mr. Malek's gun possession, so that information was not stale under Neal,

Kennedy, and Perry. Some of the older evidence of drug transactions, if each were analyzed alone, might be considered stale as some of the information was several months old. However, the court does not analyze the information separately and in a vacuum. Instead, the court analyzes the totality of the circumstances. Grant, 490 F.3d at 632. The totality of the information presented in the warrant showed a long-standing pattern on Mr. Malek's part of trafficking in drugs, using the home on South Summit Avenue and various rented hotel rooms. Where such a pattern is demonstrated, even information about drug trafficking that is somewhat older can be relevant and probative. Stachowiak, 521 F.3d at 856; Hartje, 251 F.3d at 775.

That is especially true where the older information is consistent with newer information that is clearly not stale. For example, in United States v. Carnahan, 684 F.3d 732, 735-36 (8th Cir. 2012), a search warrant was issued based on evidence of three drug transactions, two of which were approximately 45 days old and one of which had occurred 72 hours before the warrant was sought. The defendant argued the two transactions 45 days before the warrant was issued were stale. Id. The court concluded the warrant was supported by probable cause, in part because the older transactions were corroborated and supported by the transaction which occurred only 72 hours earlier, the older transactions were also corroborated by an anonymous tip and extended surveillance conducted by the police. Id.

Here, the court agrees that some of the earlier information recited in Det. Thoreson's affidavit might, standing alone, be considered stale—particularly

the information several months before the application for the search warrant. However, that older information was corroborated and supported by more recent information that was clearly not stale as well as law enforcement's own independent investigation. <u>Carnanhan</u>, 684 F.3d at 735-36. For example, the affidavit recited much more recent drug trafficking activity by Mr. Malek in August, September, and October, 2014. In addition, the affidavit described how Mr. Malek used hotel rooms in his drug trafficking activities and, when Mr. Malek was arrested on October 10, 2014 (only four days before the search warrant was requested), he had on his person the key to the hotel room for which the search warrant was being requested. The court concludes that the information on which the search warrant was based, as a whole, was not stale. <u>Id.</u>

Considering the totality of circumstances, the court concludes that Det. Thoreson's affidavit demonstrated probable cause to believe Mr. Malek was engaging in illegal drug distribution and that evidence of his crime would likely be found at his hotel room. Accordingly, the court respectfully recommends that Mr. Malek's motion to suppress based on the asserted invalidity of the search warrant be denied.

## B.     Whether the <u>Leon</u> Good Faith Exception Applies

In addition to arguing that Det. Thoreson's affidavit demonstrated probable cause, the government argues that even if it did not, the exclusionary rule should not apply here because the officers executed the search warrant in good faith. Mr. Malek disputes this. In order to provide a complete record for

reviewing courts, this court addresses this argument in the alternative to its above conclusion.

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith.  United States v. Ross, 487 F.3d 1120, 1122-1123 (8th Cir. 2007) (citing United States v. Leon, 468 U.S. 897, 921 (1984)).  "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit."  United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007).  The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.  United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008).

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included.  Leon, 468 U.S. at 923 (citations omitted); Pruett, 501 F.3d at 980; Ross, 487 F.3d at 1122.  Mr. Malek invokes the third Leon exception as applicable to the search warrant in this case.

The Eighth Circuit applied Leon in United States v. Herron, 215 F.3d 812, 814-15 (8th Cir. 2000).  In that case, law enforcement drafted an affidavit focused on providing probable cause to search Buck's residence and farm for evidence of cultivation of marijuana.  Id. at 813-14.  Then, without altering the affidavit, they submitted the same facts in support of a request for a search warrant for Herron's residence and farm.  Id.  The only facts alleged in the affidavit regarding Herron was that he had past convictions for cultivating marijuana, he was Buck's blood relative, and Buck had been observed at Herron's residence four months earlier, on which occasion he stated he was there to help Herron harvest corn.  Id.  The government conceded on appeal that the search warrant for Herron's farm lacked probable cause, but urged the application of the Leon good faith exception.  Id. at 814.  The Eighth Circuit refused to apply Leon, noting that the deficiencies in the Herron affidavit were not technical legal deficiencies, but rather a complete absence of facts probative of finding marijuana at Herron's place.  Id. at 814-15.

In determining whether a magistrate has wholly abandoned his judicial role, the court looks for an "indication that the magistrate was biased or impartial, [or for] evidence of a pattern of passive, automatic issuance of warrants."  Pruett, 501 F.3d at 980-81 (quoting United States v. Hallam, 407 F.3d 942, 946 (8th Cir. 2005)).

The third situation described above refers to alleged infirmities "with the warrant itself rather than the affidavit behind the warrant."  United States v. Carpenter, 341 F.3d 666, 673 (8th Cir. 2003).  This exception would apply, for

26

example, where the search warrant "failed to particularize the place to be searched or the things to be seized." Id. Under these circumstances, the officers executing the warrant "cannot reasonably presume it to be valid." Id. (quoting Leon, 468 U.S. at 923).

Under Leon, the court is allowed to look at information known to the officers but not recited in the affidavit. Rodriguez, 484 F.3d at 1011. Mr. Malek's counsel explored this subject extensively at the evidentiary hearing. Among the things known to Det. Thoreson but not recited in the affidavit was that he contacted Detectives Cook and Spaeth who conducted six of the SOI interviews to ensure the accuracy and reliability of the information contained in these officers' reports. Thus, Det. Thoreson assured himself of the reliability of information relayed by 10 of the 14 SOIs, either because he conducted the interrogations first-hand (4 SOIs), or because he spoke to the officers who conducted the interrogations and inquired whether the information was accurate and reliable (6 SOIs). This fact, together with the above analysis of the facts which actually were recited in the affidavit, render official belief in the warrant reasonable. Det. Thoreson's knowledge of extraneous facts is relevant here because he participated in the execution of the search warrant.

Mr. Malek also argues the information in the affidavit was so stale as to render official belief in the existence of probable cause unreasonable. Again, based on the above discussion of the staleness issue, the court concluded the totality of the evidence presented in the affidavit was not stale. Therefore,

official belief in the existence of probable cause was reasonable. As an alternative holding, then, this court recommends denial of Mr. Malek's motion to suppress on the grounds that the <u>Leon</u> good faith exception to the exclusionary rule applies in this case.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is respectfully recommended that Mr. Malek's motion to suppress [Docket No. 47] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 21st day of August, 2015.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge